## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, PEERLESS INSURANCE COMPANY, SAFECO CORPORATION and LIBERTY LIFE ASSURANCE COMPANY OF BOSTON | ) ) ) ) ) | Case No. _____ |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| GOLDMAN, SACHS & CO., | ) ) | **COMPLAINT AND JURY DEMAND** |
| Defendant. | ) ) ) | |

## I.    PRELIMINARY STATEMENT

The Plaintiffs, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company, Safeco Corporation and Liberty Life Assurance Company of Boston bring this securities fraud action against Defendant Goldman, Sachs, & Co. ("Goldman Sachs") for making materially misleading statements and omissions in connection with preferred stock offerings of the Federal National Mortgage Association ("Fannie Mae") in September and December 2007.  The Plaintiffs invested $62.5 million in those two preferred stock offerings and were misled by Goldman Sachs, underwriter of the offerings, about Fannie Mae's financial condition.  As a result of Plaintiffs' reliance on Goldman Sachs' material misrepresentations, Plaintiffs' investments are virtually worthless.  By this action, Plaintiffs seek to recover the damages they have suffered because of Goldman Sachs' fraudulent conduct.

Goldman Sachs is one of the world's oldest, largest and most successful investment banks.  For a number of years preceding its underwriting of Fannie Mae preferred stock in 2007, Goldman Sachs had a deep and wide involvement in the residential mortgage financing industry in the United States.  Real estate-related investments generated significant profits for Goldman

Sachs and were carefully monitored at the highest levels within the firm. A broad variety of exposures allowed the investment bank to participate in the real estate financial market. Goldman Sachs securitized pools of residential mortgages into mortgage backed securities ("RMBS"), formed partnerships and other entities for investing in the residential mortgage industry and created or bought and sold financial derivatives based upon residential mortgages. Goldman Sachs even purchased and operated its own mortgage origination firm.  In 2007, it was hard to find a more knowledgeable and sophisticated player in the US real estate financial markets than Goldman Sachs.

Beginning in late 2006 and all throughout 2007, Goldman Sachs, using its knowledge and sophistication about the real estate financial market, altered its investment strategy.  Goldman Sachs was aware that significant problems were developing in the subprime and Alt-A sectors of the real estate financial market. It foresaw that increasing mortgage delinquencies would lead to a dramatic increase in the number of defaults and eventual foreclosures.  The real estate bubble was about to burst and Goldman Sachs knew it.  To protect itself, Goldman Sachs sought to sell or unwind much of its own portfolio's exposure to the real estate market.  Recognizing an opportunity to generate large profits for itself, Goldman Sachs began betting against the real estate financial market by taking short positions through several vehicles, including naked credit default swaps.  The strategy proved successful, as Goldman Sachs in 2007 recorded a profit from its short real estate positions of almost $4 billion dollars.

While Goldman Sachs was betting against the real estate financial market, it served as an underwriter (Senior Co-Manager and Placement Agent) for offerings of Fannie Mae preferred stock.  In 2003 and 2004, several financial scandals occurred within Fannie Mae that involved improper accounting practices and resulted in the firing of the entire senior management team of

the company.  As a result, increased capital requirements were imposed on Fannie Mae. The stated purpose of the sale of preferred stock in 2007 was not to meet the new capital requirements, which Fannie Mae claimed to have already met, but rather to raise surplus capital to strengthen its balance sheet well beyond the required capital amounts.  The stated purpose for the offering was false.  Fannie Mae was severely under capitalized and needed to complete the sale of preferred stock just to continue in business.  As a knowledgeable and sophisticated investor in the U.S. real estate financial markets, and with access to Fannie Mae's financial records, Goldman Sachs knew or recklessly disregarded the actual status of Fannie Mae's capital structure. Specifically, Goldman Sachs knew or recklessly disregarded: 1) the actual value of Fannie Mae's portfolio investments in residential mortgage backed securities, which were significantly overstated; 2) the size of Fannie Mae's loan loss reserves, which were less than 1%, and were unrealistically low; and 3) Fannie Mae's deferred tax asset, which could not be sold or transferred, and was inflated well beyond any real world value.

## II.      JURISDICTION AND VENUE

1.      This court has jurisdiction over this matter pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1367.

2.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa because Goldman Sachs is found, is an inhabitant, or transacts business in this District.

3.      In connection with the acts alleged in this Complaint, Goldman Sachs, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the U.S. mails, interstate telephone communications and the facilities of the New York Stock Exchange.

### III.   PARTIES

4.      Plaintiff Liberty Mutual Insurance Company is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.  Liberty Mutual Insurance Company is a wholly owned subsidiary of Liberty Mutual Group, Inc., which has its headquarters in Boston, Massachusetts.

5.      Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts.   Liberty Mutual Fire Insurance Company is a wholly owned subsidiary of Liberty Mutual Group, Inc., which has its headquarters in Boston, Massachusetts.

6.      Plaintiff Peerless Insurance Company is a New Hampshire corporation with its principal place of business in Keene, New Hampshire.  Peerless Insurance Company is a wholly owned subsidiary of LIH US P&C Corporation, which has its headquarters in Boston, Massachusetts.

7.      Plaintiff Safeco Corporation is a Washington corporation with its principal place of business in Seattle, Washington.  Safeco Corporation is a wholly owned subsidiary of LIH US P&C Corporation, which has its headquarters in Boston, Massachusetts.

8.      Plaintiff Liberty Life Assurance Company of Boston is a Massachusetts corporation with its principal place of business in Boston, Massachusetts and is owned by Liberty Mutual Fire Insurance Company and Liberty Mutual Insurance Company.

9.      Defendant Goldman, Sachs & Co. ("Goldman Sachs") is a New York limited partnership with its principle place of business in New York, New York.  Goldman Sachs acted as underwriter (senior Co-Manager and Placement Agent) on two preferred stock offerings of the Federal National Mortgage Association, also known as Fannie Mae.  One offering involved 40,000,000 shares of Variable Rate Non-Cumulative Preferred Stock, Series P issued on

September 28, 2007 ("the Series P offering"), which raised nearly $1 billion for Fannie Mae. The other involved 280,000,000 shares of the Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S issued on December 11, 2007 ("the Series S offering"), which raised nearly $7 billion for Fannie Mae.

## IV.   FACTUAL ALLEGATIONS

### A.   Fannie Mae's Role in the U.S. Mortgage Market

10.     Fannie Mae is a federally chartered and stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act.  It was established in 1938 to provide stability and liquidity to the mortgage market, and legislation enacted in 1968 transformed it into a stockholder-owned and privately managed corporation.  Fannie Mae issues common and preferred stock, as well as debt, and the United States does not guarantee, directly or indirectly, the debt or the obligations associated with Fannie Mae's common and preferred stock, including dividend payments.

11.     Fannie Mae does not make mortgage loans to borrowers or conduct any other operations in the market where loans are originated, which is known as the primary mortgage market.  Instead, Fannie Mae operates in what is known as the secondary mortgage market.  It buys mortgage loans and securitizes them into Fannie Mae mortgage-backed securities ("MBS"), which then can be bought and sold in the secondary mortgage market.  Fannie Mae generates revenue in primarily two ways:  (1) it guarantees loans made by others (for which it is paid a fee), and (2) it maintains an investment portfolio of mortgage loans and mortgage-backed securities, including its own Fannie Mae mortgage-backed securities and private-label mortgage-backed securities, some of which are backed by subprime and Alt-A mortgages.

**B.     Fannie Mae's Capital Requirements**

12.     Real estate market downturns negatively impacted Fannie Mae's capitalization with respect to both its role in guaranteeing loans and its role as investor in mortgage loans and mortgage related securities.  In the event of increased defaults and delinquencies in the real estate market, Fannie Mae was required to increase its loss reserves, thereby reducing its capitalization. Likewise, losses in value on Fannie Mae's investment portfolio of mortgage loans and mortgage related securities required Fannie Mae to reduce the value of its assets, also reducing its capitalization.

13.     Since 1992, Fannie Mae has been required to maintain sufficient capital as set forth in the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (the "1992 Act").  The 1992 Act defines two measures of capital:  (1) Core Capital is the sum of outstanding common stock, perpetual noncumulative preferred stock, paid-in capital, and retained earnings. It is similar to tier 1 capital for banks and thrifts.  (2) Total Capital is Core Capital plus general allowances for loan losses.  The 1992 Act requires Fannie Mae to maintain Core Capital that equals or exceeds 2.5% of assets plus 0.45% of adjusted off-balance-sheet obligations, including guaranteed mortgage-backed securities.  Before July 30, 2008, the Office of Federal Housing Enterprise Oversight ("OFHEO") reported to Congress each quarter on whether Fannie Mae's financial statements revealed that it maintained the statutory minimum capital.  (As of July 30, 2008, the agency charged with oversight of Fannie Mae has been the Federal Housing Finance Agency.)

14.     In 2004, OFHEO undertook a special examination of Fannie Mae and issued a report in September that year, stating that it had discovered pervasive misapplications of Generally Accepted Accounting Principles ("GAAP").  OFHEO found that upper management

encouraged the misapplication of GAAP to "smooth" earnings and eliminate the volatility that GAAP requires a company to recognize and report.

15.     As a result of this investigation, OFHEO imposed a capital restoration plan that required Fannie Mae to achieve a 30% capital surplus over the statutory minimum capital requirement by September 30, 2005, and to maintain that additional capital until OFHEO modified the requirement.

16.     OFHEO issued its final report on its investigation in May 2006.  In a consent order dated May 23, 2006, Fannie Mae agreed, among other things, that its CEO and CFO would be terminated, that Fannie Mae would not increase its investment portfolio, and that Fannie Mae would improve its risk management systems, develop adequate internal accounting controls, and restate its prior period financial statements.  Fannie Mae also was required to increase its capital by issuing shares of common and preferred stock.

**C.     The Subprime Market**

17.     The United States real estate market rose dramatically through 2005 and into 2006 in large part due to the proliferation of relaxed underwriting standards and new products, particularly subprime and Alt-A mortgage loans.  Subprime and Alt-A mortgage loans have a higher risk of default than prime loans.

18.     Fannie Mae had significant exposure to the subprime and Alt-A market, both by guaranteeing these loans and by investing in subprime and Alt-A mortgage-backed securities ("MBS").  For example, Countrywide, a large subprime and Alt-A originator, accounted for approximately 26% of Fannie's single-family business volume in 2005 and 2006, and was Fannie Mae's largest lender customer as of September 30, 2007.  In addition, Fannie Mae was an active purchaser of private-label subprime MBS issued by Wall Street banks, including Goldman Sachs.  By December 31, 2006 and September 30, 2007, Fannie Mae owned or guaranteed

approximately $345 billion and $402 billion, respectively, of subprime and Alt-A mortgage loans and private-label mortgage-backed securities backed by subprime and Alt-A mortgage loans.

19.      In late 2006, the United States residential market started to decline, leading to wide-spread residential mortgage defaults and impairment in the subprime mortgage market. The defaults and impairments spread into the Alt-A mortgage market during 2007.  The value of Fannie Mae's Alt-A and subprime assets was significantly and materially compromised by this market downturn.

**D.      The Series P and Series S Offerings**

20.      On September 28, 2007, Fannie Mae issued 40,000,000 shares of preferred stock (the Series P), raising nearly $1 billion.  Plaintiffs acquired $30,000,000 of Series P preferred stock in the initial offering.

21.      On December 11, 2007, Fannie Mae issued 280,000,000 shares of preferred stock (the Series S), raising nearly $7 billion.  Plaintiffs acquired $32,500,000 of Series S preferred stock in the initial offering.

22.      Goldman Sachs was one of the lead underwriters of the Series P and Series S preferred stock offerings.

**E.      Fannie Mae Goes Into Conservatorship and Takes Astronomical Write-Downs**

23.      On July 30, 2008, the Housing and Economic Recovery Act of 2008 was signed into law and created a new regulator for Fannie Mae, the Federal Housing Finance Agency ("FHFA"), with new powers—the power to establish capital standards, to enforce its orders, and to put a regulated entity into receivership.

24.      In July and August 2008, the FHFA scrutinized the financial statements of Fannie Mae and examined its asset valuations, concluding that Fannie Mae did not have adequate capital to continue its mission of providing liquidity to the primary mortgage market.

25.     On September 6, 2008, Fannie Mae was put into conservatorship, its management and board members were replaced by the FHFA and its designees, and all dividend payments to preferred shareholders were terminated.

26.     On November 10, 2008, Fannie Mae issued its 10-Q for the quarter ending September 30, 2008, reporting a net loss for the quarter of $29.4 billion, or $13 per share.  This astounding figure was not the product of operations from the prior three months.  Instead, Fannie Mae, with its new management, re-examined the valuation of its assets and wrote down the deferred tax asset by $21.4 billion, increased the allowance for loan losses and reserve for guaranty losses by about $8.8 billion and recorded losses from other than temporary impairment on available-for-sale securities of about $1.8 billion.  In total, the adjustments reduced the company's net worth by about 79%.  As one analyst noted, "The new management team has no incentive to sugarcoat their earnings."

27.     The write-downs in asset values and increases in loan loss reserves made in the third quarter of 2008 were not the product of changes in market conditions that occurred in just the third quarter of 2008.  The housing market had been deteriorating for some time—well before the Series P and Series S preferred stock were issued.  As Fannie Mae reported in its Form 10-K for the period ending December 31, 2006, which was filed on August 16, 2007:

> This period of extraordinary home price appreciation has ended.  By many measures, prices have declined in 2007, and we expect that they will continue to decline for the remainder of this year and in 2008.  Declines in home prices are likely to result in increased delinquencies or defaults on the mortgage assets we own or that back our guaranteed Fannie Mae MBS.  In addition, home price declines would reduce the fair value of our mortgage assets…Many ARMs are expected to reset during the remainder of 2007 and 2008 and are expected to require increases in monthly payments, which may lead to increased delinquencies or defaults.  In addition, the prevalence of loans made based on limited or no credit or income documentation also increases the likelihood of future increases in delinquencies or defaults on

mortgage loans.  An increase in delinquencies or defaults likely will result in a higher level of credit losses, which in turn will reduce our earnings.

Form 10K For Period Ending 12/31/2006, Ex. A, at 32.

28.  In its Form 10-Qs for June 30, 2007 and September 30, 2007, filed on November 9, 2007, Fannie Mae stated:  "We are in the midst of a significant correction in the housing and mortgage markets.  The market downturn that began in 2006 has continued through the first three quarters of 2007….We expect these factors will continue to affect our financial condition and results of operations through the end of 2007 and into 2008."  Form 10-Q for Period Ending 6/30/2007, Ex. B, at 5 and Form 10-Q for Period Ending 9/30/2007, Ex. C, at 5.

29.  Furthermore, in the Offering Circular for the Series S preferred stock offering, Goldman Sachs noted:

> The continued deterioration of the housing market and national decline in home prices in the first nine months of 2007, along with the expected continued decline, is likely to result in increased delinquencies or defaults on the mortgage assets we own or that back our guaranteed Fannie Mae MBS.  In addition, home price declines reduce the fair value of our mortgage assets.  Further, the features of a significant portion of mortgage loans made in recent years, including loans that reset to higher interest rates either once or throughout their term, and loans that were made based on limited or no credit or income documentation, also increase the likelihood of future increases in delinquencies or defaults on mortgage loans.  An increase in delinquencies or defaults likely will result in a higher level of credit losses, which in turn will reduce our earnings.

Offering Circular, Series S, Ex. D, at 11.

## F.    United States Senate's Permanent Subcommittee on Investigations' Review of Financial Meltdown

30.  On the heels of Fannie Mae's September 6, 2008 conservatorship, the United States Senate's Permanent Subcommittee on Investigations in November 2008 began investigating the causes and effects of the financial crisis.  The Subcommittee took hundreds of depositions and interviews, reviewed millions of pages of documents, consulted with dozens of

experts, and held a series of hearings, including a hearing on investment banks.  As a result of the investigations, an April 26, 2010 Memorandum was issued from Senator Carl Levin, Subcommittee Chairman, and Senator Tom Coburn, Ranking Member, to Members of the Permanent Subcommittee on Investigations ("Subcommittee Memorandum").

31.     The Subcommittee's investigation has shown that "from 2004 to 2007, hundreds of billions of dollars in high risk mortgages flooded U.S. financial markets… [L]enders targeted high risk borrowers and engaged in risky lending practices such as little or no verification of borrower income, minimal documentation, high loan-to-value ratios, negative amortization, teaser rates, and delayed assessments of higher loan payments that could cause payment shock and increased defaults… [L]enders not only ignored signs of massive loan fraud, but also securitized and sold loans known to contain fraudulent borrower information as well as loans viewed as likely to become delinquent."  Subcommittee Memorandum, at 1.

32.     The Subcommittee's hearings further showed that "credit rating agencies bowed to pressure from investment bankers and…gave AAA ratings to financial products backed by high risk mortgages." Subcommittee Memorandum, at 2.  The credit rating agencies adjusted their ratings in July 2007.  *See Id.*

33.     On April 27, 2010, the Subcommittee held a hearing to examine the role of investment banks in the financial crisis.  Goldman Sachs was featured front and center when the Subcommittee selected it as the case study.  Many of Goldman Sachs' senior personnel, including its Chairman and CEO, Lloyd Blankfein, and Executive and V.P. and CFO, David Viniar, were called to testify.

34.     Based upon its investigation to date, which is ongoing, the Subcommittee's findings of fact concerning Goldman Sachs include the following:

a)      Goldman Sachs securitized high risk mortgages.  In exchange for large fees, Goldman Sachs during the period 2004-2007 "helped lenders… securitize high risk, poor quality loans, obtain favorable credit ratings for the resulting residential mortgage backed securities (RMBS), and sell the RMBS securities to investors, pushing billions of dollars of risky mortgages into the financial system."

b)      Goldman Sachs magnified the risk posed by the bad mortgages "by re-securitizing RMBS securities in collateralized debt obligations (CDOs), referencing them in synthetic CDOs, selling the CDO securities to investors, and using credit default swaps and index trading to profit from the failure of the same RMBS and CDO securities it sold."

c)      Goldman Sachs shorted the mortgage market.  "As high risk mortgage delinquencies increased, and RMBS and CDO securities began to lose value, Goldman Sachs took a net short position on the mortgage market, remaining net short throughout 2007, and cashed in very large short positions, generating billions of dollars in gain."

d)      Goldman Sachs created a conflict between its proprietary interests and the interests of its clients.  "In 2007, Goldman Sachs went beyond its role as market maker for clients seeking to buy or sell mortgage related securities, traded billions of dollars in mortgage related assets for the benefit of the firm without disclosing its proprietary positions to clients, and instructed its sales force to sell mortgage related assets, including high risk RMBS and CDO securities that Goldman Sachs wanted to get off its books…".

Subcommittee Memorandum, at 12.

## V.    THE MATERIAL MISREPRESENTATIONS AND OMISSIONS

35.    As underwriter, Goldman Sachs is liable for any material misrepresentations or omissions of material facts made in connection with the Offering Documents for the Series P and Series S shares. [1]

36.    Goldman Sachs' responsibilities as underwriter included pricing and selling the Series P and Series S shares.  To price the Series P and Series S preferred stock appropriately, Goldman Sachs was required to perform adequate due diligence to gain an understanding of Fannie Mae's operations and financial condition and to gain an understanding of the mortgage market.  Goldman Sachs also participated in drafting the Private Placement Memorandum for the Series P preferred stock offering and the Offering Circular for the Series S preferred stock offering and understood that potential investors expected them to perform adequate due diligence to test whether the representations made in those documents were accurate and not misleading. Further, Goldman Sachs knew that OFHEO previously found that Fannie Mae had encouraged the "smoothing" of earnings to eliminate volatility, and therefore, Goldman Sachs should have been on heightened alert when performing their due diligence of Fannie Mae.

37.    In connection with the Series P and Series S preferred stock offerings, Goldman Sachs represented to potential investors that Fannie Mae was raising additional capital to provide it with a cushion to ensure compliance, even in difficult economic conditions, not only with the minimum statutory capital requirement, but also with the OFHEO-mandated minimum capital requirement.  The Offering Documents state:

> While we are able to reasonably estimate the size of our book of business and therefore our minimum capital requirement, the amount of our reported core

---

[1] The Offering Documents include the Private Placement Memorandum and the Offering Circular, as well as documents "incorporated by reference" into the Offering Circular.

> capital holdings at each period end is less certain.  Changes in the fair value of our derivatives may result in significant fluctuations in our capital holdings from period to period.  Accordingly, we target a surplus above the statutory minimum capital requirement and OFHEO-directed minimum capital requirement to accommodate a wide range of possible valuation changes that might adversely impact our core capital base.

Preliminary Private Placement Memorandum, Series P, at 20; Private

Placement Memorandum, Series P, at 16, Ex. E, Offering Circular, Series S,

Ex. D, at 27.

38.    In connection with the Series P offering, Goldman Sachs represented to the Plaintiffs that as of June 30, 2007, Fannie Mae's core capital exceeded the statutory minimum requirement by $12.055 billion and exceeded the OFHEO-directed minimum capital requirement by $2.959 billion. Private Placement Memorandum, Ex. E, at 16.

39.    In connection with the Series S offering, Goldman Sachs represented to the Plaintiffs that as of September 30, 2007, Fannie Mae's core capital exceeded the statutory minimum by $11.410 billion and exceeded the OFHEO-directed minimum capital requirement by $2.319 billion. Offering Circular, Ex. D, at 28.

40.    The foregoing statements were material because Goldman Sachs was representing that the OFHEO-directed minimum capital was sufficient even though Goldman Sachs knew that Fannie Mae had purchased and held hundreds of billions of dollars of subprime and Alt-A mortgages and mortgage-backed securities.  Further, Goldman Sachs knew that a relatively small impairment of these mortgages and mortgage-backed securities could wipe out the OFHEO-directed minimum capital of Fannie Mae.  Moreover, Goldman Sachs knew that investors like Plaintiffs would rely on the representations made with respect to Fannie Mae's capital requirements in deciding whether to purchase the preferred stock.

## VI.   <u>FALSITY</u>

41.     The Offering Documents are false and misleading because they do not state Fannie Mae's true capitalization, including its true OFHEO-directed minimum capital as of the offering dates of the Series P and Series S preferred stock.  Further, the Offering Documents lead investors to believe that Fannie Mae was maintaining a "surplus" above the statutory and OFHEO-directed minimum capital requirements.

42.     The Offering Documents for the Series P preferred stock incorporated Fannie Mae's December 31, 2006 Form 10-K report, which was filed on August 16, 2007.  In the Form 10-K, Fannie Mae reported reserves for loan losses in the amount of $859 million, which was only 0.25 percent of the Alt-A and subprime loans as of December 31, 2006.  In fact, these reported reserves were grossly inadequate to cover the anticipated loan losses.

43.     In the December 31, 2006 Form 10-K, Fannie Mae also reported that it had a surplus of core capital over OFHEO-directed minimum capital of approximately $3.8 billion. The Series P Offering Documents represented that Fannie Mae's capitalization would increase by approximately $1 billion with the proceeds of the Series P preferred stock offering.  In fact, if adequate reserves had been recorded by Fannie Mae, there would have been no capital surplus, but instead a substantial capital deficit even with the proceeds of the Series P preferred stock offering.

44.     Goldman Sachs knew or recklessly disregarded the fact that the loan reserves reported by Fannie Mae as of December 31, 2006 were grossly inadequate, and also that if adequate loan reserves had been recorded, there would have been no capital surplus, but instead a substantial capital deficit even with the proceeds of the Series P preferred stock offering.

45.     The Offering Documents for the Series S preferred stock incorporated Fannie Mae's September 30, 2007 Form 10-Q report, which was filed on November 9, 2007. In the

Form 10-Q, Fannie Mae reported reserves for loan losses in the amount of $1.4 billion, which was only 0.35 percent of the Alt-A and subprime loans as of September 30, 2007. In fact, these reported reserves were grossly inadequate to cover the anticipated loan losses.

46.     In the September 30, 2007 10-Q, Fannie Mae also reported that it had a surplus of core capital over OFHEO-directed minimum capital of approximately $2.3 billion.  The Series S Offering Documents represented that Fannie Mae's capitalization would increase by approximately $7 billion with the proceeds of the Series S preferred stock offering.  In fact, if adequate loan reserves had been recorded by Fannie Mae, there would have been no capital surplus, but instead a substantial capital deficit even with the proceeds of the Series S preferred stock offering.

47.     Goldman Sachs knew or recklessly disregarded the fact that the loan reserves reported by Fannie Mae as of September 30, 2007 were grossly inadequate, and also that if adequate loan reserves had been recorded, there would have been no capital surplus, but instead a substantial capital deficit even with the proceeds of the Series S preferred stock offering.

48.     In the December 31, 2006 Form 10-K,  Fannie Mae also reported a deferred tax asset of $8.5 billion. In the September 30, 2007 Form 10-Q, Fannie Mae reported that the deferred tax asset had increased to $9.9 billion.  Deferred tax assets are losses incurred in prior years that can be used to offset future profits and would be considered a material part of Fannie Mae's net worth.  In fact, these reported deferred tax asset amounts were substantially overstated and were eventually written down by Fannie Mae on September 30, 2008.

49.     Fannie Mae gave no indication during 2007 that its financial position was expected to improve in 2008.   Fannie Mae's September 30, 2008 deferred tax asset of

$4.6 billion indicates that deferred tax assets as of December 31, 2006, and September 30, 2007, were grossly overstated. If Fannie Mae's deferred tax asset had been reduced to $4.6 billion at each date, Fannie Mae's OFHEO-based capital would have been reduced $3.9 billion as of December 31, 2006 and reduced $5.3 billion as of September 30, 2007.

50.     Goldman Sachs knew or recklessly disregarded the fact that the deferred tax assets reported by Fannie Mae as of December 31, 2006 and Sept 30, 2007 were substantially overstated because Fannie Mae would not realize profits in 2007, 2008 or the foreseeable future.

## VII.   SCIENTER

51.     As underwriter, Goldman Sachs had extensive knowledge, including access to non-public information, about Fannie Mae's capital inadequacy. Moreover, Goldman Sachs had entered into and profited from short positions in the subprime and Alt-A mortgage markets during 2007 that were contrary to Fannie Mae's very small (less than 1%) loan loss reserves, evincing that Goldman Sachs knew that these loss reserves were grossly inadequate.

52.     Goldman Sachs knew that the write-downs of assets and increases in loan loss reserves for Fannie Mae were woefully inadequate and that Fannie Mae had not taken adequate write-downs and loan loss reserves as of the time of the Series P and Series S preferred stock offerings. Goldman Sachs participated in the false and misleading statements set forth in the Offering Documents, and knew or recklessly disregarded that the statements were materially false and misleading when made. These statements were false and misleading because Fannie Mae's true capitalization was concealed. Goldman Sachs knew, or recklessly disregarded, the risks associated with the subprime and Alt-A market and their effect on Fannie Mae's mortgage-related assets and Fannie Mae's true capitalization.

53.     As described below, Goldman Sachs knew or recklessly disregarded Fannie Mae's capital inadequacy. During the period in 2007 leading up to the Offerings, Goldman

Sachs was well aware of the deteriorating conditions in the housing market and the need to take a close look at the value of Fannie Mae's investments in mortgages and mortgage-related securities, as demonstrated by the following: (1) Goldman Sachs was shorting the mortgage market with respect to assets held for their own account; (2) Goldman Sachs was shorting the very subprime loan originators that were Fannie Mae's lender clients; (3) Goldman Sachs had specific knowledge of the state of the subprime mortgage industry through its purchase of a controlling stake in a subprime lender; (4) Goldman Sachs knew through its role as underwriter for certain MBS about the underwriting standards and conditions of Countrywide, Fannie Mae's largest client lender in 2006 and during the first nine months of 2007; (5) Goldman Sachs' own subprime MBS products had suffered extreme losses; and (6) as underwriter, Goldman Sachs had access to the books and records of Fannie Mae.

54.     Another part of Goldman Sachs was also heavily shorting subprime and Alt-A securities in its own portfolio and profiting from such short positions.  Investors such as Goldman Sachs that enter into short positions believe that the value of the underlying asset- in this case subprime mortgages- will decline in value and essentially bet against the underlying asset.  Goldman Sachs acted on its knowledge of the subprime mortgage markets and essentially bet that the value of subprime mortgages would decline at the same time that Goldman Sachs was informing purchasers of the Series P and Series S preferred stock offerings that reserves of less than 1% was adequate.

55.     By December 2006, executives at the highest levels of Goldman Sachs were concerned about the record delinquency rates among high risk mortgages and the decline in MBS and CDO securities.  On December 14, 2006, David Viniar, Goldman Sachs' Executive Vice President and Chief Financial Officer, convened a meeting to address the subprime risk to

Goldman Sachs' business.  Viniar met with several risk managers and senior people from various trading desks.  The meeting participants "talked about how the mortgage-backed securities market 'felt.' 'Our guys said that it felt like it was going to get worse before it got better,' Viniar recalled. 'So we made a decision: let's get closer to home.'" ("Risk Management," January 4, 2009 *The New York Times*).  The *Times* article explains that "[i]n trading parlance, 'getting closer to home' means reining in the risk, which in this case meant either getting rid of the mortgage-backed securities or hedging the positions so that if they declined in value, the hedges would counteract the loss with an equivalent gain. **Goldman did both.**" (emphasis added).

56.     In a December 15, 2006 e-mail summarizing the meeting, David Viniar confirms to Tom Montag, head of Sales and Trading at Goldman Sachs, "…my basic message was let's be aggressive distributing things because there will be very good opportunities as the markets goes into what is likely to be even greater distress and we want to be in a position to take advantage of them."

57.     Documents produced to the Senate's Permanent Subcommittee on Investigations establish that during the critical time period leading up to the Fannie Mae Series P and S preferred stock offerings, Goldman Sachs not only knew about the serious risks in the mortgage market, but it was urgently moving to short the mortgage market.  The following excerpts from Goldman Sachs' own documents are compelling evidence that it knew, or recklessly disregarded, that the write-downs of assets and increases in loan loss reserves for Fannie Mae were woefully inadequate because Goldman Sachs was taking a negative view of the subprime and Alt-A market:

a)     "The vast majority, if not every 2006 Subprime CES deal (across all originators and shelves), is likely to experience some form of downgrade

in their life, and potentially sub-bond writedowns."  February 8, 2007 Goldman Sachs internal email regarding "2006 Subprime 2nds Deals Continue to Underperform".

b)  "Subprime Loans- net short spreads significantly…Alt-A Sector has not been effected yet by lower credit contagion but we expect it to come up so we've upped dilg and are turning the books fast."  Email forwarded to Lloyd Blankfein on February 11, 2006.  In response, Blankfein asks Tom Montag whether Goldman Sachs is "doing enough right now to sell off cats and dogs in other books throughout the division."

c)  "Bad news everywhere…home price appreciation (sic) data showed for first time lower prices on homes over year broad based."  February 21, 2007 email from Daniel Sparks, then Goldman Sachs' Head of Mortgages Department, to Jon Winkelried, then Goldman Sachs' Co-Chief Operating Officer.

d)  "Just fyi not for the memo, my understanding is that desk is no longer buying subprime. (We are low balling on bids.)" "Do you want to consider an additional bullet point at the very end that proactively addresses a very hot topic in the resi market place which is the fear that underwriting deterioration may be creeping into near prime product (called Alt-A) as people seek to replace lost subprime business.  For example EPDs (early payment defaults) are rising for Alt-A."  March 2, 2007 email exchange regarding presentation to Goldman Sachs' Audit Committee.

e)   "[W]e are trying to close everything down, but stay on short side….and we will likely do some other things like buying puts on companies with exposures to mortgages."  March 8, 2007 email from Daniel Sparks to, among others, David Viniar, Tom Montag, Jon Winkelried and Gary Cohn.  Cohn was Co-Chief Operating Officer of Goldman Sachs.

f)   "During the quarter, there has been significant deterioration within the sub prime mortgage sector driven by rising delinquencies and failing originators.  This fact pattern coupled with increased media attention has pushed sub prime synthetic and cash spreads dramatically wider.  CDO spreads have widened as well."  "We commenced the quarter long mortgage spreads via the ABX index and throughout the quarter covered the long position via single name CDS ending the quarter net short mortgage spreads."  March 9, 2007 email to David Viniar concerning mortgage talking points for earnings call.

g)   "We should add the various things we have done-getting short CDS on RMBS and CDOs, getting short the super-senior BBB- and BBB index, and getting short AAA index as overall protection.  The puts have also been good." "The business has purchased $60mm notional of equity put options on subprime lenders as risk mitigant to overall subprime business."  March 10, 2007 email exchange with Daniel Sparks concerning mortgage presentation to Goldman Sachs' Board of Directors.

h)   In response to events in subprime sector in Q3 and Q4 2006 and 1Q 2007, "GS reverses long market position through purchases of single name CDS

and reductions of ABX." In response to "large originators announce numerous accounting restatements/losses for 2006" and "securitization for subprime slows significantly; market for securities is dislocated" "GS effectively halts new purchases of sub-prime loan pools through conservative bids… Warehouse lending business reduced." March 26, 2007 Presentation to Goldman Sachs Board of Directors concerning the subprime mortgage business.

i)      "Sparks and the Mtg group are in the process of considering making significant downward adjustments to the marks on their mortgage portfolio esp CDOs and CDO squared." May 11, 2007 internal Goldman Sachs email.

j)      "Tells you what might be happening to people who don't have the big short." July 25, 2007 email from David Viniar to Gary Cohn.

k)      "The mortgage sector continues to be challenged and there was a broad decline in the value of mortgage inventory during the third quarter. As a result, we took significant mark-down on our long inventory during the third quarter, as we had in the previous two quarters. Although we took these marks, our risk bias in that market was to be short and that net short position was profitable. I would also note that you've heard me express our generally negative views on the outlook for mortgages since the beginning of the year, so you could correctly assume that we've been very aggressive in reducing our long mortgage exposure and conservatively marking down our long mortgage positions." "Significant losses on non-

prime loans and securities were more than offset by gains on short mortgage positions."   September 17, 2007 email exchange with Daniel Sparks and David Viniar concerning Q3 earnings call.

l)      "D]uring most of 2007, we maintained a net short sub-prime position and therefore stood to benefit from declining prices in the mortgage market." October 4, 2007 Goldman Sachs' correspondence to the Securities and Exchange Commission.

m)     "[O]verall market events since Jan of this year, but largely concentrated over the summer period, are as dramatic and interesting as I've seen in 25+ years in the business.  I use the word 'interesting' only because we're past the worst of it *at least as far as our own exposure goes*…" (emphasis added).  "[M]ortgages…ultimately culminating in an understanding that a large proportion of the 20% of US mortgages which are subprime, may ultimately become impaired."   Goldman Sachs' Tax Department Presentation dated October 29, 2007.

n)      "Of course we didn't dodge the mortgage mess. We lost money, then made more than we lost because of shorts."  November 18, 2007 email from Lloyd Blankfein to Gary Cohn.

58.     According to Goldman Sachs' September 17, 2007 presentation to its board of directors concerning its residential mortgage business, during the period March 15, 2007 through August 31, 2007, Goldman Sachs significantly reduced its Alt-A long position, evidencing Goldman Sach's belief that the Alt-A market was deteriorating.

59.     The Senate's Permanent Subcommittee on Investigations has found that "As high risk mortgage delinquencies increased, and RMBS and CDO securities began to lose value, Goldman Sachs took a net short position on the mortgage market, remaining net short throughout 2007, and cashed in very large short positions, generating billions of dollars in gain."

60.     Goldman Sach's related entity, Goldman Sachs International, entered into credit default swap contracts with AIG Financial Products Corp.  Credit default swaps were the conduit by which Goldman Sachs entered into short positions on subprime and Alt-A securities in its own portfolio.

61.     In late July and early August of 2007, Goldman Sachs was requesting approximately $1.2 billion in collateral from AIG Financial Products Corp related to certain securities, including residential mortgage backed securities (RMBS), subprime RMBS and Alt-A RMBS.   As of July/August 2007, Goldman Sachs was of the belief that certain securities, including securities backed by subprime RMBS and Alt-A RMBS, had significantly deteriorated in value.

62.     Further, by November 2007, Goldman Sachs was requesting approximately $3.2 billion in collateral from AIG Financial Products Corp related to certain securities, including RMBS, subprime RMBS and Alt-A RMBS.   From August 2007 to November 2007, Goldman Sachs' request for collateral increased from $1.2 billion to $3.2 billion, indicating Goldman Sachs' belief that the value of certain securities, including securities backed by subprime RMBS and Alt-A RMBS, had further significantly deteriorated in value since August 2007. Goldman Sachs was requesting collateral from AIG Financial Products Corp. during the July 2007 through November 2007 time period, which was during the same time that Goldman Sachs

was informing purchasers of the Series P and Series S preferred stock offerings that reserves of less than 1% were adequate.

63.     During its fiscal year ending November 30, 2007, Goldman Sachs generated approximately $4 billion in profit by betting that the value of mortgages and mortgage-related securities would decline.   Overall, Goldman Sachs generated record net earnings of approximately $11 billion in fiscal year 2007.

64.     Goldman Sachs knew the importance of calculating fair value of positions.  A September 17, 2007 email exchange with Daniel Sparks and David Viniar concerning the Q3 earnings call evinces Goldman Sachs' knowledge:  "There has been much speculation and commentary that it is impossible to mark many mortgage positions to market.  We do not agree with that.  Not only is it possible, it is absolutely essential for market participants to understand the value of what they hold so that they can manage the associated risks."  Lloyd Blankfein confirmed the Goldman Sachs' view when he wrote in an Op-Ed piece to The Financial Times, "At Goldman Sachs, we calculate the fair value of our positions every day, because we would not know how to assess or manage risk if market prices were not reflected on our books.  This approach provides an essential early warning system that is critical for risk managers and regulators."

65.     In April 2007, Goldman purchased a controlling stake in Avelo Mortgage, L.L.C. dba Senderra Funding ("Senderra").  Goldman had been a minority investor in Senderra when it was formed in 2005.  At the time of the Goldman acquisition, Senderra was a subprime lender located in Fort Mill, South Carolina and its subprime operations were overseen by Daniel Sparks, former head of Mortgages at Goldman Sachs & Co.  Goldman has moved Senderra's

focus away from subprime lending and has converted Senderra into a Federal Housing Administration (FHA) lender and refinance organization.

66.      Mortgage experts say the acquisition of Senderra "likely gave Goldman a clearer view of the market as other parts of the company made bets on home loans." *Goldman Subprime Fallout Hits Home in South Carolina* by Aaron Lucchetti, January 21, 2010, The Wall Street Journal Online.

67.      Goldman's ownership in Senderra gave Goldman Sachs specific knowledge of the state of the subprime mortgage industry.

68.      In addition to shorting the mortgage market generally, Goldman Sachs during the period just prior to the Series P and Series S preferred stock offerings was betting against the very originators of subprime loan products that were feeding mortgages to Fannie Mae.  In a July 25, 2007 email to Daniel Sparks, it was noted that Goldman Sachs was "looking for approval to opportunistically buy puts on certain mortgage originators… exposed to RMBS, CMBS. Example names include: Countrywide…".

69.      As set forth above, according to the Offering Documents, Countrywide was Fannie Mae's largest lender customer in 2006 and during the first nine months of 2007, a fact known by Goldman Sachs.

70.      Goldman Sachs was also the underwriter for certain private-label MBS comprised of Countrywide loans such as CWALT 2007-OA4 issued on March 28, 2007.  The underwriting process would have given Goldman Sachs a view into the underwriting standards and conditions of Countrywide.

71.      In addition, according to a SEC complaint against Countrywide, the poor quality of the loans originated through Countrywide's exception process became even more obvious in

the first quarter of 2007 just as Goldman was starting to short MBS holdings and request permission to short mortgage originators such as Countrywide. (Exception loans are mortgages that do not meet the general underwriting standards of Countrywide.) For example, in documents distributed at a March 12, 2007 meeting of Countrywide's credit risk committee, Countrywide's Risk Management group reported that almost 12 percent of the loans Countrywide reviewed in an internal quality control process were rated "severely unsatisfactory" or "high risk." According to the SEC, the causes for the low ratings were debt to income ratios, loan to value ratios, or FICO scores outside of Countrywide's underwriting guidelines. Similarly, by the second quarter of 2007, Countrywide's Risk Management Group began to report a serious deterioration in the performance of exception loans. The write-downs and increases in loan loss reserves related to the mortgage pools held by Fannie that were disclosed in its September 30, 2008 Form 10-Q indicate that the failures by the originators, such as Countrywide, did in fact impact the loans in these mortgage pools.

72.     Goldman Sachs' desire to buy puts on Countrywide and other subprime mortgage originators by mid-2007 evidenced its view that companies engaged in the mortgage market would have issues with profitability. This is significant because in order for Fannie Mae's tax-deferred assets to have any value, Fannie Mae would have to realize a profit. Goldman Sachs' view on mortgage originators such as Countrywide indicates that Goldman Sachs knew or recklessly disregarded the fact that the Offering Documents did not state Fannie Mae's true capitalization because Fannie Mae's deferred tax assets were grossly overstated.

73.     A September 7, 2008 article in *The New York Times*, entitled "Mortgage Giant Overstated the Size of Its Capital Base," states in part: "…regulators are said to be scrutinizing whether the companies [Freddie Mac and Fannie Mae] were trying to manage their earnings by

maneuvering the timing of reserves set aside to offset losses from defaulted loans.  Each quarter, both companies have gradually increased their loss reserves….However, **regulators and auditors felt strongly that both companies should have identified larger potential losses immediately, and set aside much more from the beginning.** Other companies, like private mortgage insurers, have identified much larger losses and have set aside much larger amounts of capital"  (emphasis added).

74.    Goldman Sachs had the motive and opportunity to conceal Fannie Mae's true financial condition.

75.    The information known to Goldman Sachs regarding the true financial condition of Fannie Mae shows that Goldman Sachs acted with scienter.

76.    Goldman Sachs received substantial compensation for its role in the Fannie Mae Series P and Series S preferred stock offerings.  For example, the underwriting discount on the Series S preferred stock offering was $70 million based on a $7 billion offering.  If Goldman Sachs had disclosed that Fannie Mae's true financial condition, after taking into account appropriate write-downs and reserves against loan guarantees, rendered its Core Capital below the level directed by OFHEO, there would have been no Series P or S preferred stock offerings and no underwriters' fees paid to Goldman Sachs.

77.    In addition, Goldman Sachs generated profits from the sale of securitized residential mortgages.  For example, during the year ended November 2007, Goldman Sachs securitized $81.4 billion of financial assets, including $24.95 billion of residential mortgages. The ability of Goldman Sachs to continue to generate profits from securitization of residential mortgages would be jeopardized if they actively sought to have Fannie Mae reduce the value of their securitization holdings and increase reserves for loan guarantees.

## VIII.   RELIANCE

78.     The information known to Goldman Sachs regarding the impact of the deteriorating market conditions on Fannie Mae before the issuance of the Series P and Series S preferred stock, coupled with the statements that Fannie Mae, before the offerings, had capital beyond that required by the statute and by OFHEO, and that the preferred stock offerings were being used to create a "surplus" of capital to allow Fannie Mae to withstand the deteriorating market conditions, misled the Plaintiffs into believing that adequate write-downs of assets and increases in loan loss reserves had already been taken.

79.     Because of its failure or refusal to write down its assets and establish appropriate reserves against loan guarantees as of the time of the Series P and Series S preferred stock offerings, Fannie Mae's Core Capital was less than OFHEO required.  Even after including the proceeds of the preferred stock offerings in 2007 in the calculation of Core Capital, Fannie Mae did not meet the minimum capital requirements that OFHEO established.

80.     Had the Plaintiffs been informed that the true amount of write-downs required would make it impossible for Fannie Mae to satisfy the OFHEO-directed minimum capital requirement, even after taking into account the proceeds of the preferred stock offerings, they would not have purchased Fannie Mae's preferred stock.

81.     These representations were material, and the Plaintiffs relied upon them in deciding to purchase the preferred stock of Fannie Mae from Goldman Sachs.

82.     In reliance on the representations made by Goldman Sachs, Plaintiff Liberty Mutual Insurance Company purchased 600,000 shares of the Series P preferred stock on September 25, 2007 (at $25 per share, an investment of $15 million) and 300,000 shares of the Series S preferred stock on December 6, 2007 (at $25 per share, an investment of $7.5 million) from Goldman Sachs.

83.     In reliance on the representations made by Goldman Sachs, Plaintiff Liberty Mutual Fire Insurance Company purchased 600,000 shares of the Series P preferred stock on September 25, 2007 (at $25 per share, an investment of $15 million) from Goldman Sachs.

84.     In reliance on the representations made by Goldman Sachs, Plaintiff Peerless Insurance Company purchased 120,000 shares of the Series S preferred stock on December 6, 2007 (at $25 per share, an investment of $3 million) from Goldman Sachs.

85.     In reliance on the representations made by Goldman Sachs, Plaintiff Safeco Corporation, through its investment advisor, purchased 800,000 shares of the Series S preferred stock on December 6, 2007 (at $25 per share, an investment of $20 million) from Goldman Sachs.

86.     In reliance on the representations made by Goldman Sachs, Plaintiff Liberty Life Assurance Company of Boston purchased 80,000 shares of the Series S preferred stock on December 6, 2007 (at $25 per share, an investment of $2 million) from Goldman Sachs.

87.     In total, Plaintiffs invested, on the dates of the offerings, $30 million in the Series P preferred shares and $32.5 million in the Series S preferred shares.

## IX.     LOSS AND LOSS CAUSATION

88.     As a result of Goldman Sachs' fraudulent conduct, the price of Fannie Mae's Series P and Series S preferred stock was artificially inflated when Plaintiffs purchased their shares in September 2007 and December 2007.  At that time, the true value of the shares was substantially lower than the prices Plaintiffs paid.

89.     Goldman Sach's false and misleading statements were  disseminated to primarily institutional investors who acquired shares of the Series P and Series S preferred stock in the initial offering.

90.     On Monday, September 8, 2008, following the weekend announcement of Fannie Mae being placed into conservatorship, the price of Fannie Mae's Series P preferred stock and Series S preferred stock fell to $2.01 and $3.42, respectively.   In June 2010, FHFA ordered Fannie Mae to de-list its shares from the New York Stock Exchange.  As of June 22, 2010, the Series P and Series S preferred stock were trading at $0.43 and $0.45, respectively.

## X.     CLAIMS FOR RELIEF

### COUNT I

**(by all Plaintiffs)**
**VIOLATION OF SECTION 10(b) OF THE**
**EXCHANGE ACT AND SEC RULE 10b-5**

91.     Plaintiffs repeat and reallege each and every allegation set forth above as if expressly set forth herein.

92.     This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

93.     Goldman Sachs, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, (a) employed devices, scheme, and artifices to defraud; (b) made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct of business which operated as a fraud and deceit upon the purchasers of Fannie Mae's Series P and Series S preferred stock, including Plaintiffs, in an effort to maintain an artificially high price for Fannie Mae's Series P and Series S preferred stock.

94.     Goldman Sachs (a) deceived the investing public, including Plaintiffs (b) artificially inflated the price of Fannie Mae's Series P and Series S preferred stock; and (c)

caused Plaintiffs to purchase Fannie Mae's Series P and Series S preferred stock at the artificially inflated prices.

95.     As set forth above, Goldman Sachs made their false and misleading statements and omissions and engaged in the fraudulent activity set forth herein intentionally and knowingly, or in reckless disregard so as to constitute willful deceit and fraud upon Plaintiffs,

96.     Goldman Sachs knew of the misrepresentations and omissions of material fact, or acted with reckless disregard for the truth.  Goldman Sachs' material misrepresentations and/or omissions were done knowingly or recklessly for purpose and effect of hiding Fannie Mae's adverse financial condition from Plaintiffs and the investing public and supporting the artificially inflated price of  Fannie Mae's Series P and Series S preferred stock.

97.     As a result of Goldman Sachs' fraud, Fannie Mae's Series P and Series S preferred stock price was artificially inflated.

98.     In reliance upon Goldman Sachs' false and misleading statements, and in ignorance of the false and misleading nature of Goldman Sachs' false statements and omissions, Plaintiffs purchased the Series P and Series S preferred stock at artificially inflated prices and Plaintiffs were thereby damaged.

99.     As set forth above, when the true facts were subsequently disclosed, the prices of Fannie Mae's Series P and Series S preferred stock  dropped precipitously.

100.     As a direct and proximate result of Goldman Sachs' wrongful conduct, Plaintiffs have suffered damages.

101.     If Plaintiffs had known about the true condition of Fannie Mae, Plaintiffs would not have purchased Fannie Mae's Series P and Series S preferred stock, or would not have done so at the artificially inflated prices at which Plaintiffs paid.

## COUNT II

### (by Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company and Liberty Life Assurance Company of Boston) VIOLATION OF M.G.L. c. 110A § 410

102.   The Plaintiffs repeat and incorporate herein all prior allegations of this Complaint.

103.   Goldman Sachs offered and sold Fannie Mae Series P and Series S preferred stock in Massachusetts by making untrue statements of material fact and by omitting material facts necessary to make the statements that were made not misleading, as alleged above. Goldman Sachs knew or in the exercise of reasonable care would have known of the untrue statements, the material omissions, and the misleading nature of the statements made.

104.   The Plaintiffs did not know that the statements made were untrue and misleading, and reasonably relied upon them to their detriment.

105.   As a result of the Plaintiffs' reliance on the Goldman Sachs' statements, the Plaintiffs have suffered damages in an amount to be proved at trial.

## COUNT III

### (by Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company and Liberty Life Assurance Company of Boston) VIOLATION OF M.G.L. c. 93A, § 11

106.   The Plaintiffs repeat and incorporate herein all prior allegations of this Complaint.

107.   The Plaintiffs and Goldman Sachs are engaged in the conduct of trade or commerce.

108.   The Plaintiffs have suffered a loss of money as a result of the use or employment by Goldman Sachs of an unfair or deceptive act or practice declared unlawful by rules or

regulations issued under paragraph (c) of § 2 of Chapter 93A, namely §§ 3.05 and 3.16(2) of 940 CMR 3.00.

## COUNT IV

### (by Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company and Liberty Life Assurance Company of Boston) MASSACHUSETTS COMMON LAW FRAUD

109.    The Plaintiffs repeat and incorporate herein all prior allegations of this Complaint.

110.    As alleged above, Goldman Sachs made false representations of material facts and omitted material facts necessary to make other statements they made not misleading.  Goldman Sachs acted knowingly or with reckless disregard for the truth, and with the purpose of inducing the Plaintiffs to purchase Fannie Mae Series P and Series S preferred stock.

111.    The Plaintiffs reasonably relied upon the statements made by Goldman Sachs and as a result have suffered substantial damages.

## COUNT V

### (by Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company and Liberty Life Assurance Company of Boston) MASSACHUSETTS COMMON LAW NEGLIGENT MISREPRESENTATION

112.    The Plaintiffs repeat and incorporate herein all prior allegations of this Complaint.

113.    As alleged above, Goldman Sachs supplied false representations to guide the Plaintiffs in their Fannie Mae Series P and Series S preferred stock purchases.

114.    Goldman Sachs made such false representations in the course of its underwriting business and in the context of its business transactions with the Plaintiffs.

115.    Goldman Sachs failed to exercise reasonable care or competence in obtaining or communicating the false representations at issue.

116.    The Plaintiffs reasonably relied upon the false statements made by Goldman Sachs and as a result have suffered substantial damages.

## COUNT VI

### (by Plaintiff Safeco Corporation)
### VIOLATION OF WASH. REV. CODE § 21.20.010

117.    Plaintiff repeats and incorporates herein all prior allegations of this Complaint.

118.    Goldman Sachs offered and sold Fannie Mae Series S preferred stock to Safeco Corporation by making untrue statements of material fact and by omitting material facts necessary to make the statements that were made not misleading, as alleged above.  Goldman Sachs knew or in the exercise of reasonable care would have known of the untrue statements, the material omissions, and the misleading nature of the statements made.

119.    Plaintiff and its investment advisor did not know that the statements made were untrue and misleading and reasonably relied upon them to their detriment.

120.    As a result of its reliance on Goldman Sachs' statements, Plaintiff has suffered damages in an amount to be proved at trial.

## COUNT VII

### (by Plaintiff Safeco Corporation)
### VIOLATION OF WASH. REV. CODE § 19.86.020

121.    Plaintiff repeats and incorporates herein all prior allegations of this Complaint.

122.    Plaintiff and Goldman Sachs are engaged in the conduct of trade or commerce.

123.    Goldman Sachs committed the deceptive act of making untrue statements of material fact and by omitting material facts necessary to make the statements that were made not misleading in the course of their business.  Goldman Sachs repeatedly committed such deceptive acts in connection with various Fannie Mae preferred stock offerings, including Series S, which

Safeco Corporation purchased through its investment advisor. This deception affected several other individual and institutional consumers (such as Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Peerless Insurance Company and Liberty Life Assurance Company of Boston), causing them to incur substantial financial losses.

124. Goldman Sachs' use or employment of an unfair or deceptive act caused Safeco Corporation to suffer substantial financial injury to its business.

## COUNT VIII

### (by Plaintiff Safeco Corporation)
### WASHINGTON COMMON LAW FRAUD

125. Plaintiff repeats and incorporates herein all prior allegations of this Complaint.

126. As alleged above, Goldman Sachs made false representations of material facts and omitted material facts necessary to make other statements they made not misleading. Goldman Sachs acted knowingly or with reckless disregard for the truth, and with the purpose of inducing the Plaintiffs to purchase Fannie Mae Series S preferred stock.

127. Plaintiff and its investment advisor were not aware that such misrepresentations and omissions of material facts were false and reasonably relied upon such statements made by Goldman Sachs. As a result, Safeco Corporation has suffered substantial damages.

## COUNT IX

### (by Plaintiff Safeco Corporation)
### WASHINGTON COMMON LAW NEGLIGENT MISREPRESENTATION

128. Plaintiff repeats and incorporates herein all prior allegations of this Complaint.

129. As alleged above, Goldman Sachs supplied false representations to guide Safeco Corporation, through its investment advisor, in its Fannie Mae Series S preferred stock purchase.

130.    Goldman Sachs had a duty to disclose Fannie Mae's true financial condition because Safeco Corporation and its investment advisor were entitled to rely upon the Goldman Sachs' representations, and Goldman Sachs had knowledge of material facts regarding Fannie Mae that Plaintiff did not.

131.    Goldman Sachs knew or should have known that they provided such information to guide Safeco Corporation, via its investment advisor, in its business transaction with Goldman Sachs.

132.    Goldman Sachs was negligent in obtaining or communicating the false information, which Safeco Corporation, through its investment advisor, reasonably relied upon in purchasing the Fannie Mae Series S preferred stock.

133.    The false statements that Goldman Sachs made have proximately caused Safeco Corporation substantial damages.

## **REQUESTS FOR RELIEF**

WHEREFORE, the Plaintiffs pray that this Honorable Court:

1.    ENTER judgment against Goldman Sachs and for the Plaintiffs on each Count of the Complaint in an amount sufficient to compensate them for their losses as described herein;

2.    AWARD Plaintiffs reasonable attorneys' fees, costs and disbursements; and

3.    AWARD such other or further relief as this Honorable Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Respectfully submitted,
LIBERTY MUTUAL INSURANCE
COMPANY, LIBERTY MUTUAL FIRE
INSURANCE COMPANY, PEERLESS
INSURANCE COMPANY, SAFECO
CORPORATION, and LIBERTY LIFE
ASSURANCE COMPANY OF BOSTON

By their attorneys:


/s/ Christopher P. Sullivan
Christopher P. Sullivan, Esq. (BBO #485120)
Lisa A. Furnald, Esq. (BBO #631059)
Robins, Kaplan, Miller & Ciresi L.L.P.
800 Boylston St., 25th Floor
Boston, MA 02199-7610
617-267-2300
cpsullivan@rkmc.com